In re ALUMINUM PHOSPHIDE ANTI-TRUST LITIGATION, This Document Relates to: All Actions.

Civ. A. No. 93–2452–KHV.

United States District Court, D. Kansas.

July 5, 1995.

Deborah Farrar Quirk, Kansas City, MO, Thomas H. Brill, Mission Hills, KS, Joel C. Meredith, Krishna Narine, Meredith, Cohen & Greenfogel, P.C., Philadelphia, PA, Vernon N. Reaser, Jr., Reaser & Wall, Victoria, TX, Issac L. Diel, Leawood, KS, for National Bugmobiles, Inc.

Edmund S. Gross, Farmland Industries, Inc., Kansas City, MO, Alvin D. Shapiro, Law Offices of Alvin D. Shapiro, Kansas City, MO, for Farmland Industries, Inc.

David E. Everson, Jr., Tammy L. Womack, Stinson, Mag & Fizzell, Kansas City, MO, Nancy L. Heilman, Cohen & Grigsby, Pittsburgh, PA, for Pestcon Systems Inc., Degesch America, Inc., Detia Freyberg, GmbH.

Eric D. Braverman, Employers Reinsurance Corp., A. Bradley Bodamer, Morrison & Hecker, Overland Park, KS, James E. Wright, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for Bernardo Chemicals Ltd., Inc., Casa Bernardo Ltd., Christina S. Bernardo.

Floyd R. Finch, Jr., Katharine S. Bunn, Jeffrey J. Simon, Sally B. Surridge, Brian J. McGrath, James R. Ward, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, Tessa K. Jacob, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, for Inventa Corp., United Phosphorus, Ltd.

G. Stanton Masters, Bryan Cave, Kansas City, MO, James L. Eisenbrandt, Bryan Cave, Overland Park, KS, Nancy L. Heilman, Cohen & Grigsby, Pittsburgh, PA, for Detia–Degesch GmbH.

Thomas M. Bradshaw, Dianne M. Hansen, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, James R. Hobbs, Marilyn B. Keller, Wyrsch, Atwell, Mirakian, Lee & Hobbs, Kansas City, MO, for McShares Inc.

## REVISED MEMORANDUM AND ORDER

VRATIL, District Judge.

This price-fixing case comes before the Court on *Defendants' Joint Motion in Limine to Exclude Dr. Richard C. Hoyt's Testimony and Expert Report From this Case* (Doc. # 443), filed May 5, 1995. Class action plaintiffs claim that defendants engaged in an illegal price-fixing conspiracy under the Sherman Act, 15 U.S.C. § 1, and—more specifically—that defendants conspired to fix the case price of aluminum phosphide pellets and tablets in the United States from January 1, 1988, through December 31, 1992. Plaintiffs seek damages on behalf of all entities (except those owned by defendants) which purchased such products during that period. Movants seek to preclude certain portions of the testimony and report of plaintiffs' economic expert, Dr. Richard C. Hoyt, under Federal Rules of Evidence 104(a), 403, 702, and 703.

On May 16, 1995, the Court held an evidentiary hearing on defendants' motion and heard the testimony of both Dr. Hoyt and defendants' economic expert, Dr. John J. Siegfried. Having considered the evidence adduced at that hearing, along with the expert reports of both Dr. Hoyt and Dr. Siegfried, the Court finds that defendants' motion should be and hereby is sustained in the respects and for the reasons set forth below.

### A. Factual Background [1]

Aluminum phosphide is a fumigant used to control insects in the storage of raw agricultural commodities and other food and non-food products. Aluminum phosphide reacts with moisture in the air and releases phosphine gas, which is toxic to insects. In the United States, aluminum phosphide is primarily sold in pellets and tablets. Until the early 1980's, the aluminum phosphide industry was dominated by a legal patent on a product called Phostoxin, sold by Degesch America. Around 1980, the patent expired and new manufacturers began to enter the market. Aluminum phosphide prices began to fall steadily over time as the advantage of the original patent monopoly eroded and new

1. Though the factual record remains to be fully developed through trial of these matters, the Court believes that the facts stated herein are generally undisputed, based on the proceedings to date.

entrants into the market gained market share.

Aluminum phosphide products may be imported and sold in the United States, but only by those companies which are registered with the Environmental Protection Agency. Between 1988 and 1993, those companies were Degesch America, Inc., Inventa Corporation, McShares, Inc., Pestcon Systems, Inc., Bernardo Chemicals, and Midland Fumigant.[2] During the relevant time period, these defendants—along with co-defendants United Phosphorus Ltd., Casa Bernardo, Detia Degesch GmbH, and Detia Freyberg GmbH—manufactured or distributed aluminum phosphide products for sale in the United States.[3]

In the late summer and early fall of 1991, the United States Department of Justice issued subpoenas with respect to an ongoing investigation of criminal price-fixing in the aluminum phosphide industry. On November 1, 1993, that investigation resulted in criminal indictments against Detia Degesch, Detia Freyberg, Degesch America, Pestcon, Casa Bernardo, Inventa, and United Phosphorus.[4] In those indictments, the United States alleged that defendants had conspired to raise the price of aluminum phosphide pellets and tablets from January, 1990, to November, 1990. Detia Degesch and Pestcon pleaded guilty to these charges, admitting that they had conspired to fix prices at a meeting in Rio de Janeiro in January, 1990. Casa Bernardo entered a plea of *nolo contendere.* The United States dismissed the charges against Detia Freyberg and Degesch America. Inventa and United Phosphorus proceeded to trial, but the United States District Court for the District of Kansas ultimately dismissed the charges against them.

## B. Findings of Fact

The Court makes the following findings of fact by a preponderance of the evidence based on the evidence and testimony presented at the hearing on May 16, 1995:

■ In order to prevail on their antitrust claim, plaintiffs must prove that they sustained injury by reason of defendants' unlawful conduct. *See Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1348 (9th Cir.1985). In doing so, plaintiffs must establish that defendants' unlawful activities caused at least some of their injury, rather than the injury being wholly attributable to other factors. *Id.* at 1349. In the absence of more precise proof, causation of injury may be found as a matter of just and reasonable inference from proof of defendants' wrongful acts and their tendency to injure plaintiffs, and from evidence of change in prices not shown to be attributable to other causes. *See Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 262–64, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). Once causation of damages has been established, the amount of damages may be determined by a just and reasonable estimate, as long as the jury verdict is not the product of speculation or guesswork. *MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1161 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

■ Plaintiffs propose to supply this evidence through the expert testimony of Richard C. Hoyt, Ph.D., president of Analytics, Inc., an economics and statistical consulting firm in Excelsior, Minnesota. Dr. Hoyt has a doctorate in Agriculture and Applied Economics. He held teaching positions at the William Mitchell College of Law in St. Paul, Minnesota from 1977 to 1978, and the College of St. Thomas in St. Paul, Minnesota from 1978 to 1979. Since that time, Dr. Hoyt has devoted his full-time attention to forensic ends: a "partial list" of his experience as an expert witness includes 121 cases (42 antitrust cases, 15 contract cases, 21 discrimination cases, 29 injury/death cases, two patent

---

**2.** Midland Fumigant is not a defendant in this case.

**3.** Non-defendants Sinochem (China), Lian Yun Gang (China), and Excel Industries (India) also manufactured aluminum phosphide products for sale and distribution in the United States.

**4.** Of the defendants in this case, McShares and Bernardo Chemicals (a wholly-owned subsidiary of Casa Bernardo) were not charged in the criminal case.

cases, 10 stockholder suits, and two toxic waste cases). In addition, in the last 25 years, Dr. Hoyt has published eight articles. Two articles, published in the *Minnesota Law Review* and the *Hamline Law Review* in 1976 and 1988, respectively, deal with comprehensive models for calculating future damage awards. Four articles on similar topics appear in the *Journal of Legal Economics* (1991 and 1993) and *Issues & Methods in Litigation Economics* (1991). Dr. Hoyt is an expert for hire.[5]

### Before and After Model

Dr. Hoyt proposes to testify to the fact and amount of damages caused by defendants' alleged conspiracy.[6] Dr. Hoyt's opinion, according to his report dated March 27, 1995, is as follows: (1) from January 1, 1988 through October 31, 1993, defendants had the ability and the economic incentive to maintain prices for aluminum phosphide pellets and tablets at "higher than competitive levels" throughout the United States;[7] (2) the market structure of the aluminum phosphide industry, "in conjunction with an agreement to fix prices ... had the effect of raising, stabilizing and maintaining prices of aluminum phosphide products at supra-competitive

levels over an extended period of time"; and (3) the fact and the extent of defendants' supra-competitive pricing can be measured by a "before and after" model which "generally compares defendants' prices in two distinct time periods (conspiratorial and normative) and calculates the degree to which prices were raised and/or maintained at artificially high levels." *Expert Report of Richard C. Hoyt,* p. 8, ¶ 8. All parties agree that the "before and after" model is well accepted within the field of economics, and that it may be properly applied to determine the fact and the amount of damages in this case. The dispute is whether Dr. Hoyt indeed applied the "before and after" model, or whether his purported application is so fundamentally flawed as to render his conclusions inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The theoretical basis for the "before and after" model, in Dr. Hoyt's words, is as follows:

[T]his model is based upon the premise that the normative period is a measure of what the competitive price would have

---

5. Because he has devoted his career to partisan adjudicatory purposes, it is perhaps no surprise that Dr. Hoyt's professional stature is unequal to that of defendants' expert, Dr. John J. Siegfried. Dr. Siegfried is a professor of economics at Vanderbilt University, where he has served with distinction for 22 years. His professional credentials include numerous visiting professorships throughout the world, service as a Fulbright Senior Scholar (1991–92), selection as current president-elect of the Southern Economic Association (the largest regional association of economists in the United States), and service on the senior staff of President Gerald Ford's Council of Economic Advisors. In 1990, the National Association of Economic Educators honored Dr. Siegfried for lifetime contributions to research on economics education. In additional, Dr. Siegfried has authored more than 100 books and articles in prestigious economic journals throughout the United States, and currently serves on the editorial boards of three such journals. In noteworthy contrast with Dr. Hoyt, Dr. Siegfried has testified as an expert in six to nine cases. Dr. Siegfried does not advertise his availability as an expert witness and he devotes only five to eight percent of his time to consulting.

6. For purposes of this ruling, the Court notes that Dr. Hoyt's report was intended and required to contain a complete statement of all opinions to

be expressed at trial, on direct examination, with the reasons and basis therefor. Plaintiffs have clearly understood and acknowledged their duty under Rule 26(a)(2) of the Federal Rules of Civil Procedure. See Letter from Angela K. Green to Hon. Kathryn H. Vratil (May 19, 1995). Out of an abundance of caution, however, and to avoid any arguable unfairness as counsel and the Court chart new paths under the 1993 amendments to Rule 26 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Court has construed Dr. Hoyt's report of March 27, 1995, as supplemented by his testimony at the hearing on May 16, 1995.

7. According to Dr. Hoyt, the following factors provided defendants the ability and economic incentive to maintain prices at higher than competitive levels: four firms (Degesch America, Pestcon, Research and Bernardo) controlled 90% of the market; demand was inelastic and declining during the time period; market entry was limited by relatively high barriers in the form of licensing and/or registration requirements by the United States government; and aluminum phosphide products are fungible. *Expert Report of Richard C. Hoyt.* at p. 7, ¶ 6.

been absent illegal conduct. Under this well accepted approach, the monetary impact to the class is the difference between the actual price and the estimated competitive price, multiplied times the quantities purchased by all class members.

*Expert Report of Richard C. Hoyt*, p. 8, ¶ 8. As noted, the "before and after" model requires that actual prices during the conspiracy period be compared to estimated competitive prices that would have prevailed during that period, absent the conspiracy. The model therefore required Dr. Hoyt to determine estimated prices that would have prevailed during the conspiracy period, based on prices that prevailed during the normative or non-conspiratorial period. By definition, "estimated competitive prices" are just that: they cannot be ascertained as historical facts but must be calculated through the exercise of expert judgment and opinion. Through application of established scientific procedures within the field of economics, economists are qualified to make such judgments and calculations.

In this case, Dr. Hoyt made the following findings and opinions concerning the estimated competitive prices that would have prevailed in the absence of a conspiracy:

(1) Estimated competitive prices for the conspiracy period (January 1, 1988 through December 31, 1992) are the prices which prevailed during the normative period (the ten consecutive months from January 1 through October 31, 1993); and

(2) The sole cause of the actual price differences between the conspiracy period and the normative period was the conspiracy itself.

The two prongs of Dr. Hoyt's analysis are critical to plaintiffs' case and they are discussed, in detail, below.

### Selection of January 1 to October 31, 1993 as the Normative Period

Plaintiffs' price-fixing claim is set against a stage of generally declining prices after 1980.

As noted above, prior to 1980, the aluminum phosphide industry was dominated by a legal patent. After the patent expired, new competitors entered the market. Prices fell steadily as the advantage of the original patent monopoly eroded and four new competitors (Pestcon, Bernardo, Inventa and Midland) gained market share. The overall decline in the selling price of aluminum phosphide progressed steadily and continuously from 1980 through October, 1993—except for a noticeable spike during roughly two quarters of 1990, coinciding with the admitted price-fixing episode by Detia Degesch, Pestcon, and Casa Bernardo.

The price decline is evidenced by the following figures: In 1988, at the beginning of the alleged conspiracy, the Degesch companies,[8] Pestcon, and Casa Bernardo almost exclusively dominated the market for aluminum phosphide pellets and tablets. In 1988, prices for those products ranged from approximately $350 to $500 per case. Over the next five years, Inventa and Midland gained increased market shares at the expense of the three formerly dominant companies. By 1993, market shares were somewhat evenly distributed among the five manufacturers, with Inventa having the largest market share and Casa Bernardo the smallest. By late 1993, prices per case had dropped by about $150, to approximately $200 to $350 per case.[9] *See* Defendants' Exhibit 4A.

Dr. Hoyt's opinion is that absent a conspiracy, the prices which prevailed during the first ten months of 1993—the normative period—would have prevailed throughout each of the five preceding years, from January 1, 1988 through December 31, 1992. According to Dr. Hoyt's written report, he selected January 1 through October 31, 1993 as the normative period for three reasons: (1) the grand jury issued subpoenas in late summer or early fall of 1991, thereby signaling to defendants that the price-fixing jig was up and triggering a resumption of competitive

---

8. For purposes of this motion, the Court refers to Degesch Weyers, Degesch Divisions, and Detia Export as the "Degesch companies."

9. According to Dr. Hoyt, when differences between the actual prices and the 1993 normative prices are multiplied times the quantities actually purchase, the total overcharge to plaintiffs is $6,263,428.24.

forces; (2) designating January 1 through October 31, 1993 as the normative period allowed "sufficient lag time" for prices to return to normal; and (3) data for January 1 through October 31, 1993 was "the last portion of the most recent calendar year for which transaction data [were] available." *Expert Report of Richard C. Hoyt,* p. 9, ¶ 9.

Upon analysis, Dr. Hoyt's opinion is flawed in several obvious respects which render his conclusions irrelevant and inadmissible in this case:

First, Dr. Hoyt's opinion ignores the *before* component of the "before and after" model. Dr. Hoyt concedes that if pre-conspiracy data is available, the preferred scientific approach is to consult the data both before and after the conspiracy period. *Transcript* (Vol. II) at 108, 111. Under that approach, the economist has statistical bookends and may *interpolate* an estimated price line for any given conspiracy period instead of extrapolating an estimated price line from a single point in time. Although Dr. Hoyt had price information for all defendants for 1986 and 1987,[10] his opinion does not address in any way the pre-conspiracy period. Therefore, Dr. Hoyt cannot account for the fact that prices before the alleged conspiracy are so substantially higher than the purportedly normal prices after the conspiracy.[11]

Second, Dr. Hoyt's opinion concerning "sufficient lag time" for normalization of post-conspiracy prices is based on neither evidence nor science. At the hearing on May 16, 1995, Dr. Hoyt defined lag time as the period when prices declined, after the indictments were handed down in August and September, 1991.[12] *Transcript* (Vol. II) at 66–67, 82. According to Dr. Hoyt, the lag time continued "at least" through 1992, because the "generally downward declining price trend" continued through that period. *Transcript* (Vol. II) at 68–69. In his view, the prices did not start to "decline or disintegrate" until the earlier part of 1992, and did not level off until 1993. *Transcript* (Vol. II) at 82.

Dr. Hoyt has expressed no opinion concerning what lag time was *necessary* for aluminum phosphide prices to return to normal levels after the alleged conspiracy ended. The evidence is undisputed that the lag time "could be very short," and could start to run (as Dr. Siegfried phrased it) "when anybody involved in the conspiracy got wind that they may be under investigation" and stopped fixing prices. *Transcript* (Vol. II) at 4. Dr. Hoyt states that the 15–month period from the issuance of the indictments to the beginning of the normative period was "sufficient" for defendants to return to competitive prices. He expresses no opinion that some shorter period (one hour? ten days? six months?) was not equally sufficient. Absent a scientifically-supported opinion in this regard, the record suggests no reason why an equally plausible normative period could not commence sometime (any time) before January 1, 1993. Nothing in Dr. Hoyt's demonstrated training as an economist or the factual record in this case has equipped Dr. Hoyt to opine with any reasonable degree of economic or scientific certainty that a 15–month lag time was necessary or sufficient for prices to return to normative levels.

In the end, Dr. Hoyt's selection of January 1 through October 31, 1993 as the normative period comes to rest on his belief that 1993 prices are normative because prices were falling during 1992 but leveled off in 1993. Dr. Hoyt does not purport to explain why—

---

10. Dr. Hoyt's complaints to the contrary are not credible, and indeed are contradicted by his own testimony at the hearing on May 16, 1995.

11. Dr. Hoyt offers no scientific rationale for his refusal to consider data from the pre-conspiracy period. Whether we accept his premise that a "before *or* after" model is just as valid as a "before *and* after" model, we must hold Dr. Hoyt to those conclusions and opinions which are grounded in the methods and procedures of science and not based on subjective belief or unsupported speculation. Dr. Hoyt's method fails to address (let alone account for) an obvious sign of error in his analytical approach—the elevated pre-conspiracy price structure—and to this extent it is not grounded in the methods and procedures of the science of economics.

12. As noted earlier, the grand jury issued subpoenas in the late summer or early fall of 1991. The government did not unseal the indictments until November 1, 1993. Thus it appears that Dr. Hoyt confused the terms "indictment" and "subpoena" in his testimony.

in an industry characterized by declining demand from January 1, 1988 through October 31, 1993[13] and generally declining prices from 1980 to date—stable prices are "normal" prices for purposes of this analysis. Nor does he purport to account for factors other than "normalization" that may have brought post-conspiracy prices to what Dr. Hoyt views as their 1993 resting place. Indeed, other post-indictment time periods demonstrate the same pattern of falling prices, followed by a leveling off. They equally comply with Dr. Hoyt's criteria for what evidences a normative period. Dr. Hoyt's analysis yields no scientific basis for adopting one period as opposed to any other.

Finally, to the extent that Dr. Hoyt has selected the normative period by reference to the availability of data (as opposed to its relevance or reliability), he offers no scientific or theoretical basis for his calculations and opinions.

Dr. Hoyt's methodology in selecting a normative period is not sound. Scientific learning in the field of economics offers no defensible reason why a prudent economist would select January 1 through October 31, 1993 as the normative period in this case. Recognized methodology for distinguishing the alleged violation period from the alleged non-violation period requires analysis of price patterns and statistical tests, including a "dummy variable approach," to determine whether for any proposed violation period the price was systematically higher than it would otherwise have been.[14] Because Dr. Hoyt failed to perform this and other relevant analysis, his choice of a normative peri-

od is not consistent with accepted economic practice. To use Dr. Siegfried words, "the way he selected the benchmark is [not] consistent with the way an economist would do it."

## Cause of Price Differences between the Conspiracy Period and the Normative Period

The goal of a prudent economist in performing the "before and after" analysis is to determine the hypothetical or "counter-factual" prices that would have prevailed during the conspiracy period, but for the conspiracy.[15] In applying the "before and after" model of damages, it is fundamentally necessary to explain the pattern of forces outside the violation period using factors that might have changed (*i.e.*, supply, demand, and differences in competition) to predict the prices during the conspiratorial period. In this context, as in most economic problems, failure to keep "other things equal" is one of the known "pitfalls . . . in the path of the serious economist." Samuelson, P. and Nordhaus, W.D., *Economics* (13th ed.) at p. 7. This case presents two potential normative periods, a "before" period and an "after" period that have distinctly different price levels. One therefore must identify the reasons for the disparate price levels.[16] According to Dr. Siegfried, the field of economics supplies a statistical methodology for making this determination on a scientific basis, and the generally accepted means of predicting the prices that would have prevailed absent the conspiracy is regression analysis. At a minimum, regression analysis addresses supply and demand factors by looking at price

13. See *Expert Report of Richard C. Hoyt* (March 27, 1995) at 6–7, paragraphs 5–6.

14. Dr. Siegfried applied the dummy variable approach to Dr. Hoyt's purported normative period, with surprising results. For two of the four companies on which Dr. Siegfried performed the dummy variable analysis, the statistical indicator method revealed that defendants' prices were actually *lower* than what would have been expected during the conspiracy period, January, 1988 through December, 1992. As a result, Dr. Siegfried concluded that Dr. Hoyt's benchmark period had "no basis."

15. The before and after model cannot be properly applied unless an appropriate normative peri-

od, however selected, has been identified. In view of the Court's finding with respect to Dr. Hoyt's selection of the normative period in this case, the proposed before and after model cannot be properly applied. Therefore, it is arguably unnecessary to discuss Dr. Hoyt's conclusion that the difference in prices between the conspiracy period and the post-conspiracy period results solely from the alleged conspiracy. In order that the record is complete, however, the Court finds in the alternative that defendants' motion should be sustained for additional reasons as well.

16. It is improper to assume that all prices compared to 1993 are non-normative, because if one looks to the period before January, 1988, one sees much higher prices than occur in 1993.

trends over time. A prudent economist must account for these differences and would perform a minimum regression analysis if utilizing the "before and after" model.[17]

Dr. Hoyt did not perform a regression analysis to address such obvious points as (1) why normative prices before the alleged conspiracy so greatly exceeded allegedly normative prices after the alleged conspiracy; or (2) the effect of supply, demand, competition or other factors that might impact price levels during both normative periods. Instead, Dr. Hoyt opined that any price increase between 1993 and the conspiracy period was caused solely by the alleged conspiracy. He took a simple weighted average of the actual prices for ten months during 1993 and assumed that that price should have prevailed at all prior points in history.[18] In doing so, Dr. Hoyt ignored price trends inside and outside the 1993 period, violating a fundamental rule of application for the "before and after" model. According to Dr. Siegfried, Dr. Hoyt's calculations did not take into account the effect of four factors: (1) a precipitous decline in demand for aluminum phosphide pellets and tablets, with downward pressure on prices, after 1988; (2) increased competition, with downward pressure on prices, because of new entrants into the market; (3) marked realignment in position between 1990 and 1993, as newcomers to the market Midland and Inventa captured the majority of the pellets and tablets market,

leaving the existing sellers to defend on the residual market by reducing prices; and (4) the fact that the aluminum phosphide market is an oligopolistic market, characterized by interdependent pricing, in which no independent seller believes that its actions will be ignored by the other sellers. *Transcript* (Vol. I) at 56–57, 114–116.

Dr. Hoyt claims that the "before and after" model "traditionally assumes" that "the conspiracy was the sole cause of the price difference between the conspiracy period and normative period." *Expert Report of Richard C. Hoyt,* p. 8, n. 8. This is not a scientifically valid assumption, and the economic literature on the "before and after" model conclusively refutes it. One of the basic principles of economics, as applied to the "before and after" model, is that changes in supply, demand, and competition affect prices, and one cannot properly assume that the sole cause of any price difference between the conspiracy period and the normative period is the conspiracy itself. All of the literature on the "before and after" model (including that cited by Dr. Hoyt)[19] includes the essential elements of modeling how changes in supply, demand, and competition affect prices—so that an estimated non-conspiracy price can be predicted for the period of violation.

Even if the "traditional assumption" is not valid in all cases, Dr. Hoyt claims that it is

---

17. An economist could go farther, by identifying specific demand and supply factors such as the cost of aluminum and phosphorus ingredients, stocks of grains, numbers of competitors, and so forth. Dr. Siegfried explained, however, that under the minimalistic analysis use of time as a variable "folds those into a single variable that's capturing all of those things put together."

18. Dr. Hoyt determined the amount of damages by using separate benchmark prices for each defendant, based on the individual defendant's average 1993 price, as opposed to a single average 1993 benchmark price for the entire industry. This approach is contrary to Dr. Hoyt's assumption that aluminum phosphide products are fungible. According to Dr. Hoyt, the fungible nature of aluminum phosphide is one of the market factors which allowed defendants the economic incentive and ability to maintain prices at higher than competitive levels. *Expert Report of Richard C. Hoyt,* p. 7, ¶ 6. Under well-accepted economic theory, however, fungible prod-

ucts—or products which are the same—will be sold at the same price in a competitive market. Dr. Hoyt uses multiple benchmark prices, ranging from $190 for Inventa to $400 for Degesch America. As Dr. Siegfried stated, this is an "enormous price difference for a product that is supposedly the same." If aluminum phosphide products are truly fungible, then a prudent economist would use a single benchmark price to calculate the amount of damages. Thus, Dr. Hoyt's selection of individual benchmark prices is inconsistent with the way an economist would do it, and his methodology is clearly calculated to exaggerate the amount of damages, without any basis in economic theory or principle.

19. *See, e.g.,* Parker, *Measuring Damages in Federal Treble Actions,* 17 Antitrust Bull. 497, 506 (1972); Hovenkamp, *Economics and Federal Antitrust Law,* p. 418 (1985) (before-and-after model must be adjusted to account for changes in market) (cited in *Expert Report of Richard C. Hoyt* at p. 8, n. 7).

empirically valid in this case because "[t]he inflated prices between 1988 and 1992 were . . . not the result of correspondingly higher costs."[20]  Under Dr. Hoyt's theory, the aluminum phosphide industry is a constant cost industry and in a constant cost industry, shifts in demand do not affect price and supply is immediately responsive to changes in demand.  Dr. Hoyt concluded that industry costs were constant because he found that no statistically significant change in Degesch America production costs during the period of the alleged conspiracy (the first quarter of 1988 through the fourth quarter 1992).  Dr. Hoyt's analysis looked only to Degesch America—the only manufacturer that incurred production costs in the United States.  Dr. Hoyt nonetheless assumed that production costs for pellets and tablets were constant across the industry.  This assumption is appropriate, according to Dr. Hoyt, since Degesch America sales comprised roughly 60 percent of the total market and the supply curve for the entire industry represented the sum of the marginal cost curves for all firms within the industry.[21]

The marginal cost curve for Degesch America would represent its supply curve, however, only if Degesch America operated in a perfectly competitive industry.  Both experts agree that the aluminum phosphide market is oligopolistic and, thus, the fact that the marginal cost of Degesch America may be constant does not necessarily mean that the supply curve of Degesch America is completely elastic.  Moreover, even if Degesch America's cost information supported Dr. Hoyt's conclusion that changes in demand would not affect price, Dr. Hoyt has not demonstrated any scientific validity to his assumption that the entire aluminum phosphide industry has an elastic supply curve.  An analysis of Degesch America's supply curve alone would have productive value in estimating the industry supply curve only if Degesch America's sales represented a very substantial portion of the industry, which

stayed the same proportion over time.  Here, of course, Degesch America's proportional share of the market was declining over time and thus it is not indicative of the supply curve of the entire industry.

Dr. Hoyt has not scientifically validated his conclusion that constant costs existed in the aluminum phosphide pellets and tablets industry, or that any such constant costs resulted in an elastic supply curve wherein changes in demand did not affect price.  Moreover, even if the Court accepted verbatim Dr. Hoyt's explanation of his constant cost conclusion, Dr. Hoyt's application of the "before and after" model still does not account for other undisputed market factors, such as increasing competition from foreign manufacturers with lower production costs, which must be considered before a reliable price may be predicted for the conspiracy period.  In short, Dr. Hoyt's assumption that any change in prices between 1993 and the conspiracy period was caused solely by the conspiracy is not scientifically or economically valid.

## C.  Conclusions of Law

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  That rule provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that Rule 702, in conjunction with Rule 104(a), requires the trial judge to act as gatekeeper to ensure that scientific expert testimony is both reliable and relevant.  The court found that the term "scientific knowledge" establishes a

---

20.  Dr. Hoyt does not seek to exclude causation factors other than higher costs.

21.  Dr. Hoyt also relied on SIC 2879, Agricultural Chemicals, which measures the industry costs for miscellaneous agricultural chemicals produced

in the United States.  Because the scope of this index is not limited to aluminum phosphide products and covers only United States companies, it is less probative than Degesch America's cost information.

standard of evidentiary reliability. *Id.* at ——, 113 S.Ct. at 2795. The court noted that the adjective "scientific" implies a "grounding in the methods and procedures of science," and the word "knowledge" means more than subjective belief or unsupported speculation and applies to any body of known facts or ideas inferred from such facts or accepted as truths on good grounds. *Id.* at ——, 113 S.Ct. at 2794. The court concluded that in order to qualify as scientific knowledge, proposed expert testimony must be supported by appropriate validation, *i.e.*, good grounds based on what is known. *Id.* at ——, 113 S.Ct. at 2795.

■ At issue in *Daubert* was the admissibility of expert testimony on the causal connection between plaintiffs' birth defects and a prescription drug, Bendectin. The *Daubert* court specifically limited its discussion to expert testimony based on scientific knowledge, but noted that Rule 702 also applies to expert testimony on technical or other specialized knowledge. *See Daubert,* —— U.S. at —— n. 8, 113 S.Ct. at 2795 n. 8. Plaintiffs argue that *Daubert* applies only to "hard" physical sciences which may be tested by scientific method, not social sciences such as economics. *Daubert* indeed enumerates four non-exclusive non-dispositive factors which the Court may consider: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) known or potential rate of error; and (4) general acceptance in the scientific community. While each of these factors may not be relevant in determining the reliability of expert testimony on non-scientific or social science subjects, the Court has no doubt that *Daubert* requires it to act as a gatekeeper, to determine whether Dr. Hoyt's testimony and report are reliable and relevant under Rule 702. To the extent that *Daubert* factors are relevant to its determination, the Court considers them along with any other relevant factors.

■ Under *Daubert*, plaintiffs bear the burden of demonstrating by a preponderance of the evidence that Dr. Hoyt is proposing to testify to (1) economic knowledge that (2) will assist the trier of fact to understand or de-termine a fact in issue. *See Daubert,* —— U.S. at —— n. 10, 113 S.Ct. at 2796 n. 10 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–176, 107 S.Ct. 2775, 2778–2779, 97 L.Ed.2d 144 (1987)). This inquiry entails preliminary assessment whether his reasoning and methodology are economically valid and can be properly applied to the facts in issue. *Id.* at ——, 113 S.Ct. at 2796. The inquiry is a flexible one, with the overarching subject being the evidentiary relevance and reliability of the principles that underlie a proposed submission. *Id.* at ——, 113 S.Ct. at 2797. The court's focus must be solely on principles and methodology, not the conclusions that they generate. *Id.* at ——, 113 S.Ct. at 2797.

■ Under Rule 702, the inquiry whether expert testimony will assist the trier of fact is essentially a question of relevance. *Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2794–95 (addressing the relationship of Rule 702 and the "general acceptance" test for scientific evidence from *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)). Like all evidentiary issues, the trial court has wide discretion in making these determinations. *United States v. Rice,* 52 F.3d 843 (10th Cir.1995). In *Rice,* the trial court refused to let defendant's expert express certain opinions, and the Tenth Circuit affirmed. In doing so, it made the following observation:

> [Defendant's expert] was really not called upon to supply specialized knowledge but to speculate and hypothesize. Traditionally, hypothesis may be an appropriate subject for expert testimony when based upon conclusions from established evidentiary facts, but here [defendant's expert's] testimony was to be based entirely on pure surmise.

*Rice,* 52 F.3d at 847. Here, likewise, plaintiffs call upon Dr. Hoyt not to supply specialized knowledge, but to plug evidentiary holes in plaintiffs' case, to speculate, and to surmise. One does not need an expert economist to do what Dr. Hoyt proposes to do. A non-expert, using Dr. Hoyt's criteria, could pick as an equally valid normative period any arbitrary time period, of any length, occurring at any time after the date of the admitted conspiracy. Dr. Hoyt's analysis is driven

by a desire to enhance the measure of plaintiffs' damages, even at the expense of well-accepted scientific principles and methodology. Nothing in Dr. Hoyt's analysis makes the data for his so-called "normative" period more relevant than the data for any other pre- or post-conspiracy period, and the record yields no factual basis for any hypothesis that will support his calculations and opinion. Similarly, a non-expert could *assume* that price-fixing accounts for all differences in price between the conspiratorial period and the normative period. To the extent that Dr. Hoyt purports to cast that assumption as an affirmative declaration based upon scientific reason and analysis, however, the Court must reject it. Dr. Hoyt's conclusions are scientifically unsound and irrelevant under *Daubert.*

Dr. Hoyt has not shown that his "before and after" model, as applied in this case, accounts for undisputed increases in competition between the conspiratorial and normative periods. *See Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 415–16 (7th Cir.1992) (expert should have separated injury due to unlawful conduct from that do to new entry in market). Nor has he justified his constant cost industry assumption or his application of individual benchmark prices for each defendants. *See Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 911 (2d Cir.) (economist's damage evidence properly excluded where no basis for assumption established), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). As such, Dr. Hoyt has not through proper scientific method established that price declines are attributable to the alleged conspiracy, to the exclusion of all other relevant factors.

Because Dr. Hoyt's opinion is based on unjustified assumptions and does not account for changes in other relevant market conditions, it would not assist a trier of fact to determine the fact or amount of plaintiffs' damages. *See, e.g., Farley Transp.,* 786 F.2d at 1351 (economist's assumption that lost profits were caused solely by defendant's illegal activities did not provide reasonable basis for calculation of damages); *MCI Communications,* 708 F.2d at 1162 (plaintiff's improper attribution of all losses to defendant's illegal acts, despite presence of significant other factors, not sufficient to permit jury to make reasonable and principled estimate of amount of damage); *Southern Pac. Communications Co. v. American Tel. & Tel.,* 556 F.Supp. 825, 1075–76 (D.D.C.1982) (damage model based on unreasonable and speculative assumptions not sufficient to support just and reasonable approximation of damages).

On this record, the Court concludes that in the respects outlined above, Dr. Hoyt's opinion is economically unreliable and therefore inadmissible under Rule 702. Moreover, any minimum probative value of Dr. Hoyt's opinion would be substantially outweighed by the danger of unfair prejudice resulting from his unsupported assumptions.

In evaluating the consequences of this ruling, the Court recognizes the apparent anomaly of its holding: that without Dr. Hoyt's opinion, plaintiffs may be stripped of their ability to recover substantial actual damages from admitted conspirators. In the final analysis, however, the problem is one of plaintiffs' making. Plaintiffs are well represented by competent, knowledgeable, experienced trial counsel. Class counsel and their expert have charted an aggressive course with respect to their damage calculations, one which under *Daubert* was not without foreseeable risk. The Court acknowledges that the issue is not free from doubt, however, and indeed pursuant to 28 U.S.C. § 1292(b), the Court certifies that this opinion involves a controlling issue of law as to which there exists substantial ground for difference of opinion, and that an immediate appeal from this order may materially advance the ultimate termination of this litigation.

**IT IS THEREFORE ORDERED** that *Defendants' Joint Motion in Limine to Exclude Dr. Richard C. Hoyt's Testimony and Expert Report From this Case* (Doc. # 443), filed May 5, 1995, should be and hereby is sustained in the respects outlined above, subject to the foregoing certification under 28 U.S.C. § 1292(b).